**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) |
| | ECF Case |
| This document relates to: | |
| *Bartoli et al,* | 24-cv-04715(GBD)(SN) |
| *vs.* | ECF Case |
| *The Islamic Republic of Iran* | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR ENTRY OF PARTIAL FINAL DEFAULT JUDGMENT AGAINST THE**
**ISLAMIC REPUBLIC OF IRAN AS TO LIABILITY AND DAMAGES ON BEHALF OF**
***BARTOLI/IRAN* PLAINTIFFS IDENTIFIED AT EXHIBIT A**

Plaintiffs, by and through counsel, Parker Waichman LLP, respectfully submit this Memorandum of Law in Support of Plaintiffs' Motion for Entry of Partial Final Default Judgment by Default Against the Islamic Republic of Iran ("Iran") as to Liability and Damages pursuant to 28 U.S.C. § 1605A.

## I.    INTRODUCTION

This action arises out of the events of September 11, 2001, during which members of the al Qaeda[1] terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks on the United States ("the September 11th attacks").

Plaintiffs brought claims against Iran based upon its direct sponsorship of al Qaeda for nearly a decade leading up to September 11, 2001, which included support that directly assisted and enabled al Qaeda to conduct the September 11th attacks. Throughout the time that Iran sponsored al Qaeda, it knew and intended that al Qaeda would use this support to conduct terrorist

---

[1] Arabic words and names are spelled differently in various sources. Plaintiff has strived for consistency as much as possible, but original spellings are maintained in quoted sources.

attacks against the United States and its allies, a goal al Qaeda announced publicly on numerous occasions prior to September 11, 2001.

After Plaintiffs properly served Iran and a sufficient amount of time passed, Plaintiffs requested that the Clerk enter default against Iran. *See* ECF No. 33. On September 16, 2025 , the Clerk of the Court issued a Certificate of Default as to Iran, as authorized by 28 U.S.C. § 1608(e). *See* ECF No. 35. Plaintiffs now respectfully request entry of judgment by default against Iran on the issue of liability, solely as to Plaintiffs' substantive causes of action established under the Foreign Sovereign Immunities Act's ("FSIA") State Sponsor of Terrorism Exception, codified at 28 U.S.C. §§ 1605A(c) and 1605A(d).[2]

Significantly, this Court already has entered judgment against Iran for identical claims, in multiple related matters consolidated before this Court in *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, based on a full evidentiary record and hearing pursuant to the FSIA. The extension of those rulings to the instant matter is both appropriate and consistent with the specific objectives that prompted the Judicial Panel for Multidistrict Litigation to centralize each of those proceedings before this Court.

## II.    FACTUAL BACKGROUND

Plaintiffs seek the entry of default judgment against Iran as to liability, based upon Iran's provision of material support to al Qaeda and direct support for, and sponsorship of, the September 11th attacks. Iran provided material support and resources to al Qaeda and bin Laden both directly

---

[2] As discussed below, the issues presented by this application for default judgment against Iran as to Plaintiff's claims under the State Sponsor of Terrorism exception have already been addressed by this Court in proceedings in related litigation in *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570. Because an application for default judgment as to Plaintiff's other causes of action may raise issues not previously addressed by the Court, Plaintiff is not seeking judgment on those other claims through the present motion, but reserves the right to do so in the future, if necessary.

and through Iran's surrogate, Hezbollah. The support provided by Iran assisted in, and contributed to, the preparation and execution of the plans that culminated in the September 11th attacks. Without Iran's active and enthusiastic support, al Qaeda could never have conducted those attacks.

The government of Iran has a long history of providing material support and resources to terrorist organizations targeting the United States and its citizens, including al Qaeda. In 2011, this Court entered Findings of Fact and Conclusions of Law in the *Havlish* case, part of the *In re Terrorist Attacks on September 11, 2001* MDL, specifically outlining Iran's longstanding role in the development of the al Qaeda network, and direct support for the September 11th attacks themselves.[3] This Court's findings of fact in the *Havlish* proceeding are supported by an array of government reports, including the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"). Among other relevant findings as to Iran, the 9/11 Commission concluded that Iran forged a cooperation agreement with al Qaeda in the early 1990's, pursuant to which Iran provided a range of training and assistance to al Qaeda for nearly a decade leading up to the September 11th attacks; and that Iran facilitated the travel of senior al Qaeda figures and several of the future 9/11 hijackers into Afghanistan, thereby directly assisting al Qaeda in the planning and execution of the September 11th attacks. *See* 9/11 Final Report at pp. 60-61, 240-241.

Although the 9/11 Commission's findings as to the nature and scope of Iran's sponsorship of al Qaeda are themselves sufficient to support entry of judgment by default in these proceedings, those findings were further corroborated by affidavits of terrorism experts Dietrich L. Snell, Dr. Daniel L. Byman, Janice L. Kephart, Dr. Patrick Clawson, Claire M. Lopez, Dr. Bruce D. Tefft,

---

[3] *See Havlish v. Bin Laden*, Docket No. 03-CV-9848-GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011). The Court's Findings of Fact and Conclusions of Law in the *Havlish* case are attached hereto as Exhibit A, and hereinafter referred to as "*Havlish* Findings, Exh. A."

Dr. Ronen Bergman, and Kenneth Timmerman, submitted of record in the *Havlish* default proceedings. Citing both the government reports of record and the corroborating affidavits, this Court recognized Iran's critical role in enabling and facilitating al Qaeda's terrorist activities, concluding, for example, that "there is clear and convincing evidence pointing to the involvement on the part of Hezbollah and Iran in the 9/11 attack, especially as it pertains to travel facilitation and safe haven." *See Havlish* Findings, Exh. A at p. 35 ¶ 213 (citing Ex. 5, Snell Affid. ¶ 23). "Iran's facilitation of the hijackers' terrorist travel operation constituted material support – indeed direct support – for al Qaeda 9/11 attacks," *Id.* at p. 39 ¶ 234 (citing Ex.4, Kephart Affid. ¶ 66), and that evidence of record "leaves no doubt that al Qaeda and the official Iranian Regime at the highest levels have been acting in concert to plot and execute attacks against the United States since early 1990s." *Id.* at p. 41 ¶ 247 (citing Ex. 6, Lopez-Tefft Affid. ¶ 352).

A.      United States' Recognition of Iran as a State Sponsor of Terrorism

The United States Government has recognized and condemned Iran's support of terrorist attacks for over 30 years. Since January 19, 1984, Iran has been designated by the United States Secretary of State as a State Sponsor of Terrorism on the basis that it "repeatedly provided support for acts of international terrorism."[4]  As a designated State Sponsor of Terrorism, Iran is subject to restrictions on exports and imports, prohibitions on economic assistance and financial and other restrictions. On March 16, 1995, in response to Iranian support of international terrorism, President Clinton issued Executive Order 12957, which prohibited United States involvement with petroleum development in Iran. On May 6, 1995, President Clinton strengthened these sanctions by signing Executive Order 12959, pursuant to the International Emergency Economic Powers

---

[4] U.S. Department of State, *State Sponsors of Terrorism*, www.state.gov/j/ct/list/c14151 htm, accessed Sept. 5, 2019. The U.S. Department of State has also designated the IRGC as a "foreign terrorist organization," *Havlish* Findings, Exh. A. at 9, ¶ 30 (citing Ex. 6, Lopez-Tefft Affid. ¶ 65), and U.G. government officials regularly have identified the IRGC as an active supporter of terrorism. *Id.* (citing Ex. 41, Clawson 2d Affid. ¶ 26).

Act. President Clinton imposed additional restrictions on Iran pursuant to Executive Order 13059 on August 19, 1997. This Order reflected the Executive Branch's intent to prohibit virtually all trade and investment activities with Iran by United States persons.

      B.    Iran's Training and Support of al Qaeda Operatives

This Court's prior findings of fact affirm that Iran "has engaged in, and supported, terrorism as an instrument of foreign policy, virtually from the inception of its existence after the Iranian Revolution in 1979." Ex. A at p. 6 ¶ 1. Beginning in the mid-to-late 1980s, Iran began formulating contingency plans for anti-United States terrorist operations. *Id*. at p. 15 ¶ 70. As this Court already has found:

> In the early 1990s, casting aside the historic bitterness between the Sunni and Shi'a sects of Islam, Sudanese religious-political leader Hassan al Turabi and Iran's political leadership and intelligence agencies established close ties, including paramilitary and intelligence connections, beginning a united Sunni-Shiite front against the United States and the West. . . .
>
> While Osama bin Laden and al Qaeda were headquartered in Sudan in the early 1990s, Hassan al Turabi fostered the creation of a foundation and alliance for combined Sunni and Shi'a opposition to the United States and the West, an effort that was agreed to and joined by Osama bin Laden and Ayman al Zawahiri, leaders of al Qaeda, and by the leadership of Iran. . . .

*Havlish* Findings, Exh. A at p. 16 ¶¶ 72-73. Though Iran and Hezbollah are largely Shiite and al Qaeda is Sunni, according to the 9/11 Final Report, "[t]he relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations." *Id.* at p. 15 ¶ 69 (citing 9/11 Report p. 61).

In 1991, bin Laden relocated his terrorist operation from Afghanistan and Pakistan to Sudan. According to the testimony of terrorism expert Dr. Matthew Levitt in a separate proceeding, the Iranian government played a "very active" role in Sudan when bin Laden operated from Khartoum. *See Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 136 (D.D.C. 2011). In

1991 or 1992, al Qaeda and Iranian operatives met in Sudan and "reached an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States." *Havlish* Findings, Exh. A at p. 16 ¶ 77 (citing 9/11 Report p. 61). After these meetings, senior al Qaeda operatives traveled to Iran to receive explosives training. *Id.* ¶ 78 (citing 9/11 Report p. 61). In 1993, bin Laden and Ayman al Zawahiri met in Sudan to develop an "alliance of joint cooperation and support on terrorism" with Iran's master terrorist, Imad Mughniyah, and Iranian officials. *Havlish* Findings, Exh. A. at pp. 16-17, ¶¶ 79-80.

> The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran, Hezbollah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hezbollah training camps operated by Mughniyah and the IRGC [defendant, Islamic Revolutionary Guard Corps] in Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence and security.

*Id.* at p. 17 ¶ 83. The al Qaeda-Iran-Hezbollah terrorist training continued throughout the 1990s. "At all times, Iran's Supreme Leader [Ayatollah Ali Hoseini Khamenei] was fully aware that Hezbollah was training such foreign terrorists." *Id.* at p. 18 ¶ 88.

In the years that followed, this terrorist alliance orchestrated and claimed responsibility for various terrorist attacks against the United States and its allies. *See, e.g., id.* at pp. 18-22, ¶¶ 90-115. Consistent with the evidence also endorsed by this Court, the United States District Court for the District of Columbia held that Iran was factually and legally responsible for the June 25, 1996 bombing of the Khobar Towers housing complex in Dhahran, Saudi Arabia. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006). Al Qaeda engaged in the planning of and preparation for the bombing. *See Havlish* Findings, Exh. A at p. 20 ¶ 104. Shortly thereafter, in August 1996, an Iranian intelligence operative involved in the Khobar Towers attack

met with bin Laden in Jalalabad, Afghanistan to continue developing their joint terrorism campaign against the United States. *Id.* at pp. 20-21 ¶ 106.

> At this time, Iranian and Hezbollah trainers traveled between Iran and Afghanistan, transferring to al Qaeda operatives such material as blueprints and drawings of bombs, manuals for wireless equipment, and instruction booklets for avoiding detection by unmanned aircraft.

*Id.* at p. 21 ¶ 107 (citing Ex. 7, Bergman Affid. ¶ 68).

The United States District Court for the District of Columbia also recognized Iran's involvement in and responsibility for al Qaeda's August 7, 1998 bombings of the United States embassies in Kenya and Tanzania. *See Owens,* 826 F. Supp. 2d at 135. That court relied on testimony of Dr. Matthew Levitt to support its conclusion regarding Iran's direct assistance to al Qaeda operatives and its provision of explosives training to Bin Laden and al Qaeda, recognizing that the "government of Iran was aware of and authorized this training and assistance." *Id.* at 139. The *Owens* Court further found that "Iran regarded al Qaeda as a useful tool to destabilize U.S. interests. . . . [T]he government of Iran aided, abetted, and conspired with Hezbollah, Osama Bin Laden and al Qaeda to launch large-scale bombing attacks against the United States by utilizing the sophisticated delivery mechanism of powerful suicide truck bombs." *Id.* at 135. Moreover, the court in *Owens* recognized that "Hezbollah's assistance to al Qaeda would not have been possible without the authorization of the Iranian government." *Id.* at 138.

This Court's findings of fact further recognize that, in or around October 2000, a United States Defense Intelligence Agency analyst was in the process of identifying connections among al Qaeda, Iranian intelligence agencies controlled by Iran's Supreme Leader, Hezbollah, and other terrorist groups. *Havlish* Findings, Ex. A at p. 22 ¶ 114. On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole* in Yemen. According to the 9/11 Report, "Iran made a

concerted effort to strengthen relations with al Qaeda after the October 2000 attack on the *USS Cole*." *Id.* at ¶ 115 (citing 9/11 Report, p. 240).

    C.    <u>Iran's Support for the September 11, 2001 Attacks</u>

In the *Havlish* proceeding, this Court held that "Iran furnished material and direct support for the 9/11 terrorists' specific terrorist travel operation" and the facilitation of al Qaeda's operatives' travel to training camps in Afghanistan was "essential for the success of the 9/11 operation." *Havlish* Findings, Exh. A at p. 22 ¶¶ 116, 118-119. This finding is consistent with the statement in the 9/11 Report that "[f]or terrorists, success is often dependent on travel . . . For terrorists, travel documents are as important as weapons." *Id.* at ¶ 117 (citing 9/11 Report, p. 384).

This Court's findings of fact confirm two separate, but related, ways in which Iran directly facilitated and supported al Qaeda relative to the September 11, 2001 attacks:

> The first way in which the Iranian government materially and directly supported the 9/11 terrorist travel operation was by ordering its border inspectors not to place telltale stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Several of the 9/11 hijackers transited Iran on their way to or from Afghanistan, taking advantage of the Iranian practice of not stamping Saudi passports. Thus, Iran facilitated the transit of al Qaeda members into and out of Afghanistan before 9/11. Some of these were future 9/11 hijackers.
> * * *
>
> Iran's willingness to permit the undocumented admission and passage of al Qaeda operatives and 9/11 hijackers provided key material support to al Qaeda. By not stamping the hijackers' passports, by providing safe passage through Iran and into Afghanistan, and by permitting Hezbollah to receive the traveling group . . . Iran, in essence, acted as a state sponsor of terrorist travel.

*Id.* at pp. 22, 24, ¶¶ 122, 132. This Court's findings on this point are corroborated by National Security Administration intercepts made available to the 9/11 Commission shortly before the publication of the 9/11 Report. *See id.* at p. 123. Moreover, "[n]umerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay

confirm the existence of the clandestine Iran-Afghanistan passageway." *Id.* at p. 23 ¶ 128 (citing

Ex. 2, Timmerman 2nd Affid. ¶¶ 115-19).

> The second way in which Iran furnished material and direct support for the 9/11 attacks was that a terrorist agent of Iran and Hezbollah helped coordinate travel by future Saudi hijackers. As found by the 9/11 Commission, "[i]n October 2000, a senior operative of Hezbollah [Imad Mughniyah] visited Saudi Arabia to coordinate activities there. He also planned to assist individuals in Saudi Arabia in traveling to Iran during November. . . ."
>
> * * *
>
> The "activities" that Mughniyah went to Saudi Arabia to "coordinate" revolved around the hijackers' travel, their obtaining new Saudi passports, and/or U.S. visas for the 9/11 operation, the hijackers' security, and the operation's security.

*Havlish* Findings, Exh. A at pp. 24-25, ¶¶ 134, 140. This Court found that those activities also

"constituted direct and material support for the 9/11 conspiracy." *Id.* at p. 25 ¶ 144.

Additionally, Iran's provision of material support to al Qaeda continued after the

September 11, 2001 attacks, "most significantly by providing safe haven to al Qaeda leaders and

operatives, keeping them safe from retaliation from U.S. forces, which invaded Afghanistan."

*Id.* at p. 33 ¶ 198. Indeed, the Department of State's *Patterns of Global Terrorism* report for

calendar year 2002, released in April 2003 by the Secretary of State and Coordinator for

Counterterrorism, recognized that "al-Qaida members have found virtual safe haven there [in

Iran] and may even be receiving protection from elements of the Iranian Government."[5]

In sum, it is by now well established that Iran provided al Qaeda with critical training

and support, from the earliest stages of al Qaeda's formation through September 11, 2001, and

even thereafter. Iran's assistance provided al Qaeda with the expertise and resources necessary

to carry out large scale international terrorist attacks, and directly enabled al Qaeda to plan and

carry out the September 11th attacks. As this Court already has held, Iran's provision of material

support and resources was instrumental in ultimately causing the deaths and injuries of the

---

[5] *See* http://www.state.gov/documents/organization/20117.pdf, at p. 77.

thousands who suffered from the September 11th attacks, including Plaintiffs, and subjects Iran to liability for their injuries.

## III. JURISDICTIONAL BASIS FOR RELIEF UNDER THE FSIA

A.    This Court Has Subject Matter Jurisdiction over Iran Pursuant to the FSIA

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Samantar v. Yousef*, 130 S.Ct. 2278, 2286 (2010) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). Under the architecture of the FSIA, foreign states are presumed to be immune from suit in the courts of the United States unless one of the FSIA's enumerated exceptions to immunity applies. *See* 28 U.S.C. §§ 1605-1605A; *Samantar*, 130 S.Ct. at 2277-78. As discussed below, this Court already has held that subject matter jurisdiction exists for claims against Iran for injuries resulting from the September 11th attacks under two separate, independent provisions of the FSIA: the State Sponsor of Terrorism exception (28 U.S.C. § 1605A) and the noncommercial tort exception (28 U.S.C. § 1605(a)(5)). *Havlish* Findings, Exh. A at p. 46 ¶ 4.[6] Those rulings control in relation to the present application, although this motion focuses solely on the jurisdictional grant and substantive remedies provided under § 1605A.

B.    This Court's Prior Holding that It Has Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1605A is Controlling

In its findings of fact and conclusions of law issued in the *Havlish* case, this Court held that it had subject matter jurisdiction for claims against Iran for injuries resulting from the

---

[6] On September 28, 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016), which provides an additional ground for jurisdiction and liability against Iran. *See id.* § 3. However, because an application for default judgment as to Plaintiff's claims under the new statute would potentially raise issues not previously addressed by the Court, Plaintiff is not seeking judgment in reliance on the newly enacted statute, but reserves the right to do so in the future, if necessary.

September 11th attacks pursuant to both §§ 1605A and 1605(a)(5) of the FSIA, explaining as follows:

> Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity. *See* 28 U.S.C. § § 1330(a) and 1604. *Owens v. Republic of Sudan*, 2011 WL 5966900 (D.D.C. Nov. 28, 2011). Here, this Court has jurisdiction because service was proper and defendants' conduct falls within both the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and the "noncommercial tort" exception of § 1605(a)(5).

*See Havlish* Findings, Ex. A at p. 46 ¶ 4.

Through the present motion, Plaintiff seeks entry of default judgment as to liability solely in relation to the substantive cause of action arising under § 1605A, and thus only the exception to immunity provided under that section is implicated by the instant proceedings.[7] With respect to that issue, this Court's prior holding that § 1605A provides a proper basis for subject matter jurisdiction for claims against Iran for injuries resulting from the September 11th attacks is controlling, and the issue need not, and indeed should not, be re-litigated in the context of the present default judgment proceeding. *Federal Insurance Co. v. Kingdom of Saudi Arabia,* 741 F.3d 353, 358 (2d Cir. 2013) (explaining that the "September 11 cases were centralized in part to 'prevent inconsistent pretrial rulings'"). As in the *Havlish* case, the instant action asserts claims against Iran for personal injuries resulting from the September 11th attacks, based on the Defendant's extensive sponsorship of al Qaeda during the decade leading up to the attacks, and direct support for critical aspects of the 9/11 operation itself. The evidentiary and factual record supporting the present claims is identical to the record this Court considered in issuing judgment against Iran in the *Havlish* proceeding. Given the complete identity of the present claims to those present in *Havlish*, there can be no dispute that this Court's ruling that § 1605A provided a proper basis for jurisdiction for the claims

---

[7] As indicated previously, Plaintiff reserves the right to pursue judgment against Iran on additional common law and statutory theories of liability, and to invoke jurisdiction pursuant to § 1605(a)(5) in that context.

against Iran in the *Havlish* action also controls as to the personal injury claims asserted in this action.

This Court has also previously extended the ruling in *Havlish* to apply to other related actions against Iran in other actions pending in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, in the *Hoglan*, *Federal Insurance*, *Ashton*, and *O'Neill* cases. *See, e.g., Hoglan v. Islamic Rep. of Iran*, 1:11-cv-07550-GBD, ECF No. 112 (Aug. 31, 2015); *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570, ECF Nos. 3014 (*Ashton*), 3016 (*O'Neill*), 3020 (*Federal Ins.*) (Aug. 31, 2015).

For all the foregoing reasons, this Court's prior ruling concerning the applicability of Section 1605A to claims against Iran for injuries resulting from the September 11th attacks applies with full force to the claims asserted against Iran in the instant matter.

C.    This Court has Personal Jurisdiction over Iran

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991).[8]  Service under the FSIA is governed by 28 U.S.C. § 1608(a)(4), which provides, in relevant part, that Plaintiff send two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state, to the Secretary of State in the District of Columbia, who will transmit one copy of the papers through diplomatic channels to the foreign state and send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted. Plaintiffs have met all of those requirements in this case.

---

[8] The Second Circuit has ruled that foreign states are not persons within the meaning of the Due Process Clause. *Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan Republic*, 582 F.3d 393, 399-401 (2d Cir. 2009). Thus, the personal jurisdiction analysis as to Iran does not include a due process component.

Plaintiffs initiated this suit against Iran on June 20, 2024, through the filing of a Summons and Short-Form Complaint. *See* ECF Nos. 1,6. Iran is not amenable to service under 28 U.S.C. § 1608(a)(1) or (2) because no special arrangement for service exists between Plaintiff and Iran and because no international convention applies to service of judicial documents upon Iran. Before serving Iran under 28 U.S.C. § 1608(a)(4), Plaintiff tried to serve it pursuant to 28 U.S.C. § 1608(a)(3). *See* ECF No. 34, ¶ 6 (Affidavit in Support of Default). The service attempt as to Iran was not successful within 30 days. Service on Iran was effectuated on May 19, 2025, when the U.S. Department of State, assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran delivered the Service Documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic note number 1056-IE. *See* ECF No. 31, ¶ 9. Proof of service was transmitted to the Clerk of the Southern District of New York Clerk, addressed to Tammy M. Hellwig, dated June 24, 2025, from Jared Hess, Attorney Advisor, United States Department of State. *See* ECF No. 32. On September 15, 2025, Plaintiffs filed a request for a Certificate of Default as to Iran and an Affidavit in Support of Default. ECF Nos. 32, 34. On September 16, 2025, the Clerk of the Court issued a Certificate of Default as to Iran. ECF No. 35.

Iran has not answered or responded to the Complaint, nor has it entered any appearance in the litigation. Because service upon Iran was proper, and § 1605A of the FSIA provides subject matter jurisdiction for Plaintiffs' claims against Iran, this Court may exercise personal jurisdiction over Iran. *Shapiro,* 930 F.2d at 1020; *see also Reed v. Islamic Republic of Iran,* No. 03-2657 (RMU), 2012 U.S. Dist. LEXIS 24866, at *7 (D.D.C. Feb. 28, 2012).

**IV.    STANDARDS FOR FSIA DEFAULT JUDGMENTS AND 1605A LIABILITY**

A.    <u>Legal Standard for FSIA Default Judgment</u>

Under the FSIA, "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state . . . unless the claimant established his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Reed*, 2012 U.S. Dist. LEXIS 24866, at *14 (considering evidence presented by plaintiffs after satisfaction of jurisdictional requirements); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief."). To prevail in a FSIA default proceeding, a plaintiff must present a "legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002). This standard is the same standard used for granting judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). *See, e.g., Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (adopting standard used in *Ungar* and finding Iraq liable for September 11, 2001 terrorist acts).

Courts within the Second Circuit have noted that the proper standard for establishing liability under the FSIA should be "less than normally required," *id.* at 223, and that a plaintiff need merely demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case. *See Ungar*, 211 F. Supp. 2d at 98. A plaintiff meets its burden of proof by affidavit or similar evidence, *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002), and a court considering entry of default judgment may "accept plaintiffs' uncontroverted evidence as true." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 193 (D.D.C. 2008); *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 106 (D.D.C. 2007).

Section 1608(e) does not require a new evidentiary hearing to establish liability when a foreign sovereign is in default. *See Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (finding evidence in form of affidavits and exhibits sufficient to satisfy § 1608(e)); *Int'l*

14

*Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 262 (D.D.C. 2001) (accepting as true plaintiffs' uncontroverted factual allegations supported by documentary and affidavit evidence without evidentiary hearing). Instead, a plaintiff seeking a default judgment under the FSIA may meet its burden by entering into evidence certified transcripts of relevant testimony presented in a previous proceeding. *See Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 22 (D.D.C. 2001) (adopting findings by relying on affidavit testimony and certified transcript from another proceeding are sufficient to establish Iran's provision of material support and resources to al Qaeda). In lieu of filing affidavits from witnesses that testified in a previous case, plaintiffs may submit certified copies of the witnesses' transcript from the previous case to establish particular facts. *See Weinstein*, 175 F. Supp. 2d at 22; *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) ("when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation … without necessitating the formality of having that evidence reproduced.'" (citing *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 6-7 (D.D.C. 2011)); *see also Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 10 (D.D.C. 2011) (taking judicial notice of sworn testimony and documentary evidence presented in prior proceedings which arose out of 1995 Gaza strip bombing at issue in *Haim* litigation).

Additionally, considering the "multiplicity of FSIA-related litigation," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010), courts acknowledge that "a FSIA court may take judicial notice of related proceedings and records in cases before the same court." *Wultz v. Islamic Republic of Iran,* 864 F. Supp. 2d 24, 29 (D.D.C. 2012).

Although judicial notice of findings of fact does not itself establish the truth of such facts under the Federal Rules of Evidence, "'the FSIA does not require this Court to re-litigate issues

that have already been settled' in previous decisions. . . . Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the representment of such evidence." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (taking judicial notice of findings of fact and conclusions of law made in *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), which also arose out of 1983 Beirut bombing); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109 (D.D.C. 2012) (same); *Heiser*, 466 F. Supp. 2d at 263 (taking judicial notice of facts findings made in case brought against same defendants for damages arising from same 1996 attack on Khobar Towers); *see also Leibovitch v. Syrian Arab Republic,* No. 08 C 01939, 2014 U.S. Dist. LEXIS 82487 (N.D. Ill. Mar. 31, 2014) (taking judicial notice of findings of fact in related proceedings arising out of terrorist attack where defendants failed to appear or otherwise plead).

> [T]he statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same "terrorist attack … Rather, the requirement was intended to ensure that the Courts give proper deference to the political branches' predominant role in foreign affairs by pausing to ensure the validity of their actions before undertaking the substantial step of piercing sovereign immunity and entering judgment against a foreign state. Mindful of these interests, courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them.

*Rimkus*, 750 F. Supp. 2d at 172.

As set forth below, this Court's prior findings of fact, and the affidavits and documentary evidence already of record, provide a detailed record of Iran's involvement with and sponsorship of al Qaeda and the September 11, 2001 attacks, and are more than sufficient to support entry of default judgment against Iran as to liability in the instant action, pursuant to the substantial liability standards governing Plaintiffs' § 1605A(c) claims.

B.    Plaintiffs State a Cause of Action Under the Terrorism Exception of the FSIA

In addition to establishing a basis for subject matter jurisdiction for Plaintiffs' claims against Iran, §1605A also provides a substantive cause of action imposing liability against Iran for Plaintiffs' injuries. Pursuant to § 1605A(c), a country designated as a State Sponsor of Terrorism shall be liable to a national of the United States for personal injury or death caused by that country's provision of material support or resources. *See* § 1605A(a)(1); (c). As the District Court for the District of Columbia explained in 2011:

> A straightforward reading of § 1605A(c) is that it creates a federal cause of action for four categories of individuals: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of such a person . . . The cause of action is further described as "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official employee or agent of that foreign state, for which the courts of the United States may maintained jurisdiction under this section for money damages."

*See Owens*, 826 F.Supp.2d at 153 ("liability under section 1605A(c) will exist whenever the jurisdictional requirements of section 1605A are met") (citing *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 460 (D.P.R. 2010)).

Section 1605A(c) authorizes the recovery of economic damages, solatium, pain and suffering and punitive damages.

C.    Material Support

1.    Definition of "Material Support or Resources"

The basis of Iran's liability is its provision of material support and resources to al Qaeda which caused the September 11, 2001 attacks and resulted in the death and injuries of thousands of United States citizens. *See, e.g., In re Islamic Republic of Iran Terrorism Litig*., 659 F. Supp. 2d at 59 (explaining Iran's material support to HAMAS in the form of funding, safe haven, training

and weapons was responsible for suicide attacks). In order to demonstrate that Plaintiffs have a cause of action under §1605A, Plaintiffs must satisfy the elements of § 1605A(a)(1). *See Owens*, 826 F. Supp. 2d at 153.

In FSIA cases involving terrorist attacks caused by a foreign state's provision of material support or resources, a court must "determine whether a defendant country has provided material support to terrorism . . . consider[ing] first, whether a particular terrorist group committed the terrorist act[9] and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

Section 1605A(h) adopts the definition of "material support or resources" set forth in 18 USC § 2339A:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]

18 U.S.C. § 2339A(b)(1).

The record evidence concerning Iran's support of al Qaeda easily satisfies this definition of "material support." Indeed, this Court already has entered a conclusion of law recognizing that Iran "provided material support and resources to al Qaeda for acts of terrorism" including the September 11, 2001 attacks. *Havlish* Findings of Fact, Exh. A at p. 50 ¶ 17; *see also id*, at p. 47 ¶ 7 ("plaintiffs have established that their injuries were caused by defendants' acts of 'extrajudicial killing' and/or the provision of 'material support for such acts.'"). This conclusion

---

[9] Obviously, al Qaeda's responsibility for committing the September 11th attacks is undisputed, and a matter plainly subject to judicial notice.

clearly is correct, as the definition of material support prohibits the provision of any form of property or service to a terrorist organization, making specific reference to "expert advice or assistance" and "transportation" and "financial" services, all of which are forms of support Iran provided to al Qaeda. And the definition plainly recognizes the critical benefits terrorists obtain through any support that assists them in traveling, by expressly including "safe haven," "lodging," "false documentation or identification" and "transportation" as forms of prohibited support. 18 U.S.C. § 2339A(b)(1); *see also Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 55 (D.D.C. 2006) (recognizing provision of training and travel documents to facilitate acts constitutes material support); *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-54 (E.D. Va. 2007) (safe haven); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998) (superseded by enactment of §1605A) ("routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes 'providing material support or resources' for a terrorist act within the meaning of the [terrorism exception of the FSIA]").

> 2.    Causation

The applicable standard of causation is liberally construed in § 1605A material-support cases— namely, in such cases, Plaintiffs do not need to demonstrate any direct nexus between the material support and the eventual terrorist act.[10] It has been established that a "plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act for which his claim arises in order to satisfy [the terrorism exception of the FSIA]." *Flatow*, 999 F. Supp. at 18; *see also, e.g., In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 44 (holding that there is no but-for causation requirement).

---

[10] Courts addressing liability under the FSIA generally are guided by the principles of the Restatement (Second) of Torts. *Reed*, 2012 U.S. Dist. LEXIS 24866, at *15-*16 (granting motion for default judgment pursuant to §1605A).

Once again, this Court already has determined that the record evidence concerning the material support Iran provided to al Qaeda is more than sufficient to satisfy the modest causation requirement of 1605A(c). Indeed, this Court concluded that Iran's assistance "constituted direct support and material support for al Qaeda's 9/11 attacks. Exh. "A" at p. 24 ¶ 133 (citing 9/11 Final Report); *see also id*, at p. 47 ¶ 7 ("plaintiffs have established that their injuries were caused by defendants' acts of 'extrajudicial killing' and/or the provision of 'material support for such acts.'").

## V. EVIDENCE OF IRAN'S DIRECT AND MATERIAL SUPPORT OF AL QAEDA FOR THE SEPTEMBER 11, 2001 ATTACKS

### A. Iran's Material Support of Al Qaeda Caused the September 11, 2001 Attacks

This Court already has analyzed the evidentiary record submitted in the *Havlish* proceeding, and issued findings of fact and law on the basis of that evidence. Although additional materials could be offered to augment that record, the Court's holdings in *Havlish* render any such supplementation unnecessary. Under the circumstances, the submission of additional or repetitive evidence would merely impose an unnecessary burden on the resources of the Court. To avoid that result, Plaintiff respectfully requests that the Court enter default judgment against Iran as to liability on the basis of the evidence the Court previously received and analyzed, and which already forms part of the record in the related multidistrict litigation proceeding for the September 11, 2001 terrorist attacks (03 MDL 1570). As to the content and import of that evidence, Plaintiffs respectfully refer the Court to its own findings of fact and law, which comprehensively review the Court's findings upon review of that evidence.

## VI.    JUDGMENT AS TO DAMAGES

For the reasons set forth below and in the accompanying declaration of Raymond C. Silverman ("Silverman Declaration"), the Plaintiffs identified in Exhibit A to the Silverman Declaration further moves this Court for an Order awarding (1) compensatory damages for pain and suffering in an amount commensurate with the injuries that Plaintiffs sustained during the Terrorist Attacks on September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date.

### A.    Related Cases

Relying on evidence and arguments[11] submitted by Plaintiffs in *In re Terrorist Attacks on September 11, 2001*, the consolidated multidistrict litigation arising out of the 9/11 Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of the *Havlish, Ashton, O'Neill, Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran (*See* ECF Nos. 2516, 3014, 3016, 3020, 3020-23). After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* Plaintiffs and their decedents. Upon the submissions of the *Havlish* Plaintiffs, on October 3, 2012, this Court found that "Plaintiffs may recover for [inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4).  In such an action, . . . family members can

---

[11] In each of the Orders of Judgment regarding Plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

In that same decision in *Havlish,* this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5.  The Court has also applied that 3.44 multiplier to judgments in the *Ashton* case. *See* ECF No. 3175, at 3 (Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier).  The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett/Iran*.  ECF No. 3666.  However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the Plaintiffs' request for punitive damages be denied without prejudice.  ECF Nos. 3358 at 11-16 and 3363 at 28.  Judge Daniels adopted Judge Netburn's Reports and Recommendations in their entirety. ECF Nos. 3383 at 2 and 3384 at 6.

## VII.    Damages Under § 1605A

Section 1605A of the Foreign Sovereign Immunities Act (FSIA) creates an exception to sovereign immunity allowing a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28 U.S.C. § 1605A(a)(1). The statute specifies that damages are available "for personal injury or death," 28 U.S.C. § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).

A.    Personal-Injury Damages

The injured parties identified in Exhibit A, were on site at the time of the terrorist attacks in New York, New York (at the World Trade Center complex) and were injured on September 11, 2001. The injuries of individuals who were injured on September 11, 2001 range from smoke inhalation to devastating cancer diagnoses. One injury that accompanies one Plaintiff identified in Exhibit A is the onset of post-traumatic stress disorder as an individual caught in the horror of the attacks on September 11, 2001. Under the FSIA, these injuries are all compensable, and given that these injuries occurred either as a direct result of the attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of attempting to assist or render aid to the injured or endangered or to flee from the scene, the proximate causation of these injuries is not in question.

This Court has previously examined personal-injury damages in the context of the terrorist attacks on September 11, 2001. In the first Report and Recommendation issued by Magistrate Judge Netburn addressing personal-injury damages in this context (which was affirmed by Judge Daniels without objection), the Court found that an upward departure from prior D.C. Circuit precedent was appropriate where "personal injury plaintiffs cannot escape the memory of 9/11." *See* ECF No. 5879 at 5. This accorded with Magistrate Judge Maas' determination in 2012 that the "profound agony and grief" resulting from the attacks and the "frequent reminders of the events of that day" and "[c]onsidering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families, I find that it is appropriate to grant the upward departures from the [D.C. District Court] framework that the Individual Plaintiffs have collectively requested." *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105 (S.D.N.Y. July 30, 2012) (adopted by Judge Daniels at *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *80-*82 (S.D.N.Y. Oct. 3, 2012)).

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." *Id.* at 6. The Court divided the categories of injuries into three classifications:

1. "Significant" injuries (presumptively $5 million for pain and suffering): "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthma from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." *Id.* at 6-7.

2. "Severe" injuries (presumptively $7 million for pain and suffering): "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries (presumptively $10 million for pain and suffering): "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic trauma. Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

The Court issued upward or downward departures based on the facts of each case presented. For example, in the case of Plaintiff Lauren Manning, this Court granted an upward departure and found that Manning was entitled to a $25,000,000 judgment, noting that Manning's injuries were "beyond devastating." *See* ECF No. 5955 at 3-4.

B.    <u>Punitive Damages</u>

Under the FSIA, Plaintiff is also entitled to punitive damages. *See* 28 U.S.C. §1605A(c)(4). In the *Havlish* Report and Recommendation on Damages, the magistrate judge explained that a

"3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks." (ECF No. ECF 2619, at 13, citing *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.C. 2011)). This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory) (ECF No. 2623). The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, ECF No. 3175, at 3 (Magistrate Judge Maas Report and Recommendation to apply 3.44 punitive multiplier); ECF No. 3229, at 1 (Judge Daniels adopting in its entirety Judge Maas' Report and Recommendation to apply 3.44 multiplier); ECF No. 3300, at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the Plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363, at 28. Judge Daniels adopted Judge Netburn's Report in its entirety, denying without prejudice the Plaintiff's request for punitive damages.  ECF No. 3384, at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiff herein requests leave to address the issue of punitive damages at a later date. *See, e.g.*, ECF No. 3666 (Judge Daniels order in *Burnett/Iran*, authorizing other plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

C.    <u>Prejudgment Interest</u>

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp.

2d 48, 86 (D.D.C. 2011). This Court awarded the *Havlish* Plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001 until the date of judgment (ECF 2619 at 13-14). This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* Plaintiffs' expert.

After the *Havlish* award, Plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states. *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA"). *World Trade Farmers Market, Inc. v. American Airlines, Inc*. (*In Re: September 11th Litigation*), 2015 U.S. App. LEXIS 16619, *66 (2d Cir. Sept. 17, 2015). In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest. *Id*. Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the Plaintiffs' 9/11 claims. *Id*.

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF

No. 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6.

In light of the Court's decision in the *Hoglan* matter, applying the 4.96 percent rate to prejudgment interest, the Plaintiffs identified in Exhibit A respectfully requests that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001 until the date of the judgment.

## VIII.   CONCLUSION

This Court has previously found that, for more than a decade before the September 11, 2001 attacks, Iran conspired with al Qaeda and other terrorist organizations in an effort to wage a *jihad* against the West. By providing material support and resources to al Qaeda, Iran facilitated the September 11, 2001 attacks on the United States, and caused catastrophic loss of life. Plaintiffs respectfully request that the Court grant Plaintiffs' motion for entry of judgment by default as to liability against Iran as to Plaintiffs' claims under §1605A(c) of the FSIA.

The Plaintiffs identified in Exhibit A further requests that this Court award (1) compensatory damages for pain and suffering in an amount commensurate with the injuries that Plaintiffs sustained during the Terrorist Attacks on September 11, 2001 and in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases factoring in an upward departure on damages values based on the indelible impact of the Terrorist Attacks of September 11, 2001; (2) prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment; and (3) leave for the Plaintiffs identified in Exhibit A to seek punitive damages, economic damages, or other damages at a later date.

Dated:  November 10, 2025

Respectfully submitted,

**/s/** Raymond C. Silverman
Raymond C. Silverman, Esq.
Melanie H. Muhlstock, Esq.
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: 516-466-6500
Fax: 516-466-6665
Email: rsilverman@yourlawyer.com
Email: mmuhlstock@yourlawyer.com


Attorneys for Plaintiffs